# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| MARINA NICOLE TURNER | No.  54010-0-II |
| Respondent, | |
| v. | |
| RANDOM ERIK VAUGHN | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — In this action regarding his Committed Intimate Relationship (CIR), Random Vaughn appeals the trial court's order ruling him in default, excluding his and his witnesses' testimony, exhibits, supporting claims, and striking of his pleadings, and the trial court's order dividing property following the termination of the CIR with Marina Turner.  The division of assets included several businesses with ties to the marijuana industry.  The trial court found that Vaughn failed to disclose cash income generated from his marijuana businesses and imputed income to Vaughn.  Vaughn's 36 assignments of error fall into three categories:  he argues that the trial court abused its discretion when it (1) granted sanctions that included default, excluding testimony, exhibits, and claims, and striking Vaughn's pleadings and witnesses' testimony; (2) determined a lay witness was an expert based on experience; and (3) divided assets so that the division was not just or equitable.  We find no error and affirm.

FACTS

This appeal is the second to arise from the dispute between Marina Turner and Random Vaughn following the termination of their CIR in February 2016. Our opinion from the first appeal provides necessary factual background for the relationship between the parties in this appeal.

I. TURNER AND VAUGHN'S RELATIONSHIP

In his prior appeal before us, Vaughn appealed the trial court's ruling that he and Turner entered into a CIR, and we affirmed. *In re Committed Intimate Relationship of Turner & Vaughn*, No. 50190-2-II (Wash. Ct. App. Apr. 24, 2018) (unpublished) http://www.courts.wa.gov/opinions/pdf/D2%2050190-2-II%20Unpublished%20Opinion.pdf, *review denied*, 191 Wn.2d 1015 (2018) (hereinafter, *Turner* I). Our opinion in *Turner* I summarizes the relevant facts surrounding Turner and Vaughn's relationship.

> Vaughn and Turner started dating in May 2011. Throughout the relationship, Vaughn repeatedly asked Turner to take his last name. In greeting cards, he referred to Turner as his wife. On Facebook, he held himself out as a married man.
>
> The couple jointly signed a lease for an apartment in Lynwood, Washington, and moved in together in October 2011. Initially, Turner and Vaughn each paid half the rent.
>
> By November 2011, the couple opened a joint bank account. Both Turner and Vaughn also maintained separate bank accounts. Turner used the joint account to pay for the couple's household and personal expenses. Vaughn claimed he only put Turner on the account to process payments for his marijuana business, and that he told Turner she could not take any of the money in the account from the marijuana business. The trial court found Turner lacked credibility on this point.
>
> Vaughn used Turner's social security number for debit and credit transactions of his marijuana business, and then deposited the funds into their joint account. Turner testified that Vaughn told her she had no budget, and that she withdrew $9,140 a month on average without protest from Vaughn.

2

In April 2012, Turner purchased a vehicle and had it titled in both of their names.

In September 2012, Turner and Vaughn moved from their Lynwood apartment after jointly signing a lease for a California apartment. From September 2012 to March 2014, Vaughn spent half his time in California with Turner, and half his time in Washington for work. During their time in California, Vaughn received pay stubs, business invoices, bank statements, and utility bills listing the address of the California apartment. . . .

Turner worked full time in California, contributing to payments for rent and shared expenses. In November 2012, Vaughn sent Turner an e-mail telling her he loved her. He referred to their apartment in California as their home. Throughout 2013, Vaughn had some business meetings in California, but still maintained a place of business in Washington and received mail at a post office box in Washington.

In April 2013, the couple had an argument. Vaughn claimed the two then broke up. Turner told her family and Vaughn's family about the argument. Days later, Turner told Vaughn that she was pregnant, and the two reconciled. Shortly thereafter, Vaughn bought a ring for Turner.

A month later, the couple traveled to Thailand with family. While there, the couple exchanged vows and rings and took photos. Vaughn wore a ring on his wedding finger. The couple never received a legal certificate of marriage. Vaughn claimed that he told Turner from the beginning of the relationship that he would not get married. Upon returning home, Vaughn refused to marry Turner. "[H]e was worried about the federal ramifications of being married with his activity in marijuana." Report of Proceedings (RP) (Feb. 15, 2017) at 102.

In August, Vaughn expressed his love for Turner. In December, the couple's first child was born. After the birth, the family moved back to Washington. They stayed with Vaughn's parents until jointly signing a lease for an apartment in Puyallup. Turner stopped working and cared for their child. . . .

In April 2015, Turner discovered she was pregnant . . . . Vaughn became upset and told Turner he thought another baby would ruin their relationship. Vaughn claimed this argument amounted to a break up, because he told Turner that the relationship was over, but the trial court found he lacked credibility on this point. In July, Vaughn began spending a few nights a week in Oregon for work. Around the same time, he started a relationship with another person.

In early December, Vaughn moved out of the couple's Puyallup apartment. The couple's second child was born about a month later. In February [2016], Turner became aware of Vaughn's other relationship.

*Turner* I at 2-4 (alterations in original).

## II. TERMINATION OF CIR AND *TURNER* I

Turner petitioned for a termination of the couple's CIR in February 2016. *Turner* I at 5. She filed for a division of the couple's property and liabilities. *Turner* I at 5. She then filed a separate petition for a parenting plan and child support. *Turner* I at 5. The trial court bifurcated the issues of whether a CIR existed, the parenting plan, and child support, from division of property. *Turner* I at 5. The trial court held a trial on whether a CIR existed. *Turner* I at 5. The trial court ruled that the parties had a CIR from October 2011 through December 2015. *Turner* I at 5. We summarized:

> The [trial] court found that "throughout the entire trial, [Vaughn had] been incapable of telling the truth." RP (Mar. 9, 2017) at 660. The court considered [Turner's declaration asserting that Vaughn filed a false police report] in making the parenting plan decision and in disallowing Vaughn unsupervised contact with the children. The judge also said her decision that Vaughn had engaged in an abuse of conflict was not dispositive until reading the declaration.
>
> The court issued a written order on the CIR issues and the parenting plan, which formalized its oral ruling.
>
> Vaughn filed a motion and declaration for a new trial and recusal of judge. Vaughn primarily argued that the declaration affected the court's ruling on the parenting plan, but that he was entitled to a new trial on all issues because the declaration may have affected the court's decision on all contested issues. He argued that by providing a working copy of the declaration to the judge, Turner engaged in an ex parte communication in violation of RPC 3.5(a) and (b). In the alternative, Vaughn argued that by considering the alleged ex parte communication, the judge created an irregularity in the proceeding under CJC 2.9(A)(1), requiring a new trial and recusal if the court granted a new trial. The court denied the motions.

*Turner* I at 5-6.

Vaughn appealed and we affirmed on all issues. *Turner* I at 6, 15. The issue of division of property remained with the trial court and proceeded to trial in May 2019.

### III.  VAUGHN'S BUSINESSES AND TRANSACTIONS

When the parties met in 2011, Vaughn was running a video production company in Everett and Turner worked as a hair stylist in the Seattle area.  Turner introduced Vaughn to a friend who worked in the marijuana industry.  After this, Vaughn became interested in the marijuana industry and began growing marijuana.  In 2012, Turner and Vaughn obtained medical marijuana cards together to enable Vaughn to increase the limit on the number of plants Vaughn could legally grow.

A.      *Vaughn's Early Medical Marijuana Ventures*

Early in the relationship, Vaughn was involved in medical marijuana collectives.  Through his connections, Vaughn became involved in a medical marijuana collective called Pacific Green Collective.[1]  Although multiple people were involved in Pacific Green, Vaughn claimed sole ownership.

In 2014, Vaughn also purchased a medical marijuana dispensary from Christine Morris for $17,000.  When Morris operated the dispensary, at least 60% of her business was transacted in cash.[2]

Pacific Green also accepted debit and credit card payments as well as cash.  Pacific Green processed the debit and credit card payments though a third-party merchant services company called Square.  Because of the federally-illegal nature of marijuana sales, banks would not provide accounts to marijuana businesses; as a result, Vaughn used his personal bank account to

---

[1] Vaughn's former name was Erik Davenny.  He changed his name in 2012.  His former name appears on several business records.

[2] It is unclear from the record whether Vaughn folded the dispensary he purchased into Pacific Green, created another LLC, or merely took possession of Morris's inventory and clientele.

conduct business transactions. Square also repeatedly stopped providing services to Vaughn when it discovered marijuana transactions were taking place through its system. To work around this, Vaughn set up a Square account using Turner's social security number. The funds generated by Vaughn's marijuana sales through Square went to the couple's joint account. By November 2015, Vaughn's marijuana ventures were generating more than $188,000 of revenue a month in debit and credit card sales alone. In 2015, Turner received a 1099 tax document from Square for $2,227,463. Pacific Green's gross revenue in 2015 was more than $5 million.

B.      *Dank's Wonder Emporium: Vaughn's Recreational Marijuana Business*

In November 2013, Vaughn created Dank's Wonder Emporium, a sole-member LLC, as the business entity to enter Washington's recreational marijuana market. Vaughn also incorporated several businesses in Oregon under the Dank's name. Vaughn repeatedly applied for a recreational cannabis license under the Dank's name in 2013, 2014, 2015, and 2016. Dank's Wonder Emporium eventually received a recreational marijuana license from the Washington Liquor and Cannabis Board 2016. Dank's Wonder Emporium was a cash-only business located at 6906 Martin Way East, in Lacey.

Vaughn established multiple other LLCs associated with his marijuana businesses. Original Investments, LLC, of which Vaughn was the sole member, provided ATM services and banking-like services for Dank's Wonder Emporium and other marijuana businesses. The record is silent as to Original Investments' financial information other than Vaughn stating, "[W]e've hired a new bookkeeper company, and we are going through it meticulously." 10 Verbatim Report of Proceedings (VRP) (June 12, 2019) at 870. Vaughn also contracted his services to another store that uses the "Dank's" name in Edmonds. Vaughn received $500 per hour for his

services there, and Original Investments paid the rent and payroll for the Edmonds store, as well as operated ATMs there. Vaughn did not disclose or present to the trial court any financial information for his income from his connection to the Edmonds location of Dank's other than to state, "That's in the books that we are working on." 10 VRP (June 12, 2019) at 872. He did acknowledge paying $7,800 in rent for the location, as well as payroll and other expenses. Vaughn did not divulge how much he was paid by the Edmonds store and it is not reflected on his tax returns.

C.      *Corporate Entities Vaughn Established after Turner Petitioned to Terminate the CIR*

In February 2016, following Turner's petition to terminate the CIR, the trial court issued a restraining order and order to show cause, restraining Vaughn from "transferring, or removing, encumbering, concealing or in any way disposing of property except in the usual course of business . . . and requiring each party to notify the other of any extraordinary expenditures made after the order is issued." Supp. Clerk's Papers (CP) at 510.

On March 16, 2016, Vaughn removed $1,078,000 from a checking account in violation of the February 2016 order. Christina McCormick, a member of Pacific Green Collective, accepted $1,078,600 from Vaughn on behalf of Pacific Green. The next day, the trial court entered a temporary order enjoining Vaughn from "allowing the savings account which contains more than $1 million to drop below $625,000." CP at 148-49. Vaughn was present at the March 17 hearing, but did not inform the court that he had already removed the funds from the bank

account the day before. At that same hearing, Vaughn's counsel admitted that Vaughn's income totaled more than $150,000 per month.[3]

In May 2016, Vaughn formed 6906 Martin Way East, LLC. Original Investments, LLC, was the sole member of 6906 Martin Way East, LLC. 6906 Martin Way East, LLC, owned the building at that same address, which housed Dank's Wonder Emporium. In May 2016, Pacific Green Collective loaned 6906 Martin Way East, LLC, $692,109 to purchase the building at that same address. The mortgage required monthly payments of $100 with a balloon payment of $2.8 million due in 2056.

Also in May 2016, Vaughn formed 1402 West Reynolds, LLC, as a sole-member LLC.[4] 1402 West Reynolds, LLC, also purchased property at 1402 West Reynolds Avenue, Centralia, using a loan from Pacific Green Collective for $200,743.96.

Vaughn never disclosed to Turner the purchases, documents, or bank records related to 6909 Martin Way East, LLC, 1402 West Reynolds, LLC, or their associated properties.

Vaughn created a corporate entity in Canada in October 2018 under the Dank's Wonder Emporium name. Vaughn launched a crowdfunding campaign to begin franchising the Dank's Wonder Emporium dispensaries. Vaughn also has interests in a marijuana store in New Jersey

---

[3] At the March 2016 hearing, Vaughn was represented by Kenneth J. Levey. Levey withdrew shortly after this hearing. Vaughn then hired attorney Barbara Sylvester and requested primary custody of the parties' children and for Turner to pay him $5,000 per month in child support. At some point, Sylvester withdrew, and Clayton R. Dickinson began representing Vaughn.

[4] It is unclear from the record on appeal whether business documents listed Vaughn or Original Investments as the sole member of 1402 West Reynolds, LLC. The trial court determined Vaughn was the sole owner of 1402 West Reynolds, LLC, and any commercial property there. Due to the interlinked nature of these entities, the trial court found that Vaughn was the sole member and sole owner of Original Investments, 6906 Martin Way E, LLC, 1402 West Reynolds, LLC, and Dank's Wonder Emporium.

and connections to marijuana distributors in California. Original Investments also operated out of a California address. None of these business dealings were disclosed to Turner. The record on appeal is silent as to any financial records from these entities.

D.       *Vaughn's Payments to Turner and the Parties' Car*

On March 17, 2016, the trial court ordered Vaughn to pay Turner $2,617.25 per month in child support. He did not pay, and from June 2016 through January 2017, he paid less than $700 per month. The trial court also ordered Vaughn to pay Turner $9,140 per month in draws. Vaughn initially failed to comply with this order also. On August 15, the trial court ordered Vaughn to pay his proportional share of work-related daycare. Again, he did not initially comply. On June 21, the court issued a warrant for Vaughn's arrest due to his refusal to appear at the contempt hearing for failing to pay the $9,140 per month draws to Turner. The warrant provided Vaughn could post $25,000 bail to avoid incarceration. The record on appeal is silent as to whether Vaughn posted bail, but Vaughn paid the draws and work-related daycare costs once he faced incarceration.

On August 23, 2016, the trial court granted Turner an order permitting her to relocate with the children from Washington to California. On the night of August 24, Vaughn and his girlfriend entered Turner's gated apartment complex and stole Turner's car that was packed with her and her children's belongings in preparation for her move.[5] Vaughn then sold the car to his girlfriend for $10. The car contained Turner's purse and wallet. The court sanctioned Vaughn over $13,000 for his refusal to return the car, and obtain insurance and California license plates.

---

[5] The car was community-like property in Turner's possession.

Following the 2017 trial in which the trial court ruled the parties were in a CIR (which we affirmed in *Turner* I), Vaughn produced a purported "Separate Asset Agreement." Clerk's Papers (CP) at 365. Turner testified that she did not sign the agreement and never saw it. Vaughn's attorneys received no copy of the original. No expert witness testified as to the time and date the document was produced. The trial court found that Vaughn had created the document, forged Turner's signature, and lied to the court about its existence.

IV. 2019 TRIAL AND DIVISION OF PROPERTY

The division of property proceeded to trial in May 2019. On May 17, eleven days before trial, Turner filed a motion for default, contempt of court, to strike Vaughn's testimony, witnesses' testimony, and pleadings, and for attorney fees under CR 37(b)(2). Turner argued that based on the above facts, as well as other information pertaining to Vaughn's marijuana business dealings, Vaughn continually ignored or violated court orders and refused to disclose his full business dealings and true income. The motion included a list of bank statements Vaughn did not provide and cancelled checks he did not produce. Turner argued that under *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997), a "harsher remed[y]" under CR 37(b) was appropriate.[6] CP at 257. However, Turner did not ask for specific assets in her motion, and instead requested a "fair and equitable" division of assets and establishment of child support.

---

[6] Under CR 37(b)(2)(C), an order striking pleadings or rendering a default judgment against a disobedient party is permitted if a party fails to obey an order to provide or permit discovery. *Burnet* provides that for this remedy to apply, the record must clearly show (1) one party willfully or deliberately disobeyed a discovery rule or order, (2) that this substantially prejudiced the opponent's ability to prepare for trial, and (3) that the trial court explicitly considered whether a lesser sanction would have sufficed. 131 Wn.2d at 494.

10

On May 28, the first day of trial, the trial court held a hearing on the motion. The court stated it would not rule on the motion for default, but would hold the trial and, based on what was in Turner's motion, decide what should be considered or disregarded.[7]

At the trial, the division of property largely focused on Vaughn's marijuana businesses and associated ventures. Witnesses testified as to the facts in Part III, above. Morris testified as Turner's witness and conservatively estimated 60% of her business was done in cash.

Vaughn did not provide to the trial court any balance sheet, income statement, profit-and-loss spreadsheet, or cash receipts journal for Pacific Green. Vaughn stated, "[O]ur bookkeeping wasn't the best, but you know, we had some pretty standard expenses. . . . [T]he big majority of it for the cannabis was paid in cash, and we kept as good of records as possible." 10 VRP (June 12, 2019) at 734. None of Pacific Green's tax documents, which were prepared for Vaughn by CPA Dani Espinda, accounted for any cash it received. Vaughn testified that Dank's Wonder Emporium, LLC, was "defunct" at some point in 2014 or 2015 because he had not paid renewal fees. However, the Washington Secretary of State listed that the LLC had been in perpetual existence since March 2014.

Shelley Drury, an accounting expert presented by Vaughn, explained Dank's business practices regarding cash:

---

[7] It appears the trial court proceeded to trial to determine the facts for a fair and equitable division of assets. This aligns with the trial court's statement at a May 13, 2016, hearing on Turner's motion to shorten time and contempt for failure to file records, where the court explained, "I will consider further remedies to a finding of failing to answer, slash, update interrogatories at the time of motions in limine . . . . So that this case can be tried as much as possible on the accurate information, which both parties should be providing to the other." 5 VRP (May 13, 2019) at 89.

> [The cash] went to one of two places: Original Investments to pay bills on behalf of the business or to the safe. The safe was used to refill the cash machine, to purchase product, and to pay other – any incidental small expenses that needed to be paid kind of on the spot, and the log was reflective of that.

9 VRP (June 3, 2019) at 537, 560. Drury also stated that sales in retail marijuana have to be cash. Espinda (Vaughn's other CPA), Morris (Turner's witness) and one more of Vaughn's witnesses with experience in the industry testified that it is substantially a cash industry.

Drury calculated Dank's lost $17,790 from April 2018 through March 2019. But she admitted that this calculation was only as accurate as the documents Vaughn provided her. She later stated, "I'm not giving an opinion on what their profit actually is or isn't. Their accounting records are unreliable." 9 VRP (June 3, 2019) at 619.

On July 3, 2019, the trial court issued a letter ruling. The court explained that it had reserved ruling on Turner's motion for default and held the trial to "determine for itself" whether there was a basis for the facts alleged in Turner's motion. CP at 335. The court then adopted the facts as set forth in Turner's motion and granted Turner's motion for default. Citing *Burnet*, the court excluded Vaughn's testimony, his witnesses' testimony, exhibits, supporting or opposing claims or defenses, and struck his pleadings.

The trial court explained its reasoning in its decision. "These actions are the least restrictive in this case as it is impossible to set child support or equitably divide community-like property in a CIR where the only party with knowledge refuses to disclose financial information the court requires to make a decision." CP at 335. The court excluded Vaughn's testimony "based upon [his] intentional nondisclosure, willful violation of court order and intentional failure to respond to discovery requests throughout the lawsuit." CP at 336.

12

The court awarded Turner $625,000—the amount Vaughn was required to maintain in the bank account, $500,000 remaining in a trust account, the real estate at 6909 Martin Way East and 1402 West Reynolds, and the value of the car Vaughn stole. The court also found Vaughn in contempt and ordered he pay $125,000 in attorney fees. The court based its determination on the amount of funds awarded to Turner on Vaughn's refusal to present a full accounting of his cash income to the court. The court explained:

> [Vaughn] also has a web of interrelated LLC's and businesses in numerous locations within and without the U.S., all 'owned' by him solely. One of the Respondent's businesses continues to annually produce at least 4 million dollars in marijuana sales alone.
>
> On these amounts . . . it is just and equitable, given all of the testimony and the court's findings, including many additional current and past sources of undisclosed businesses, that petitioner receive the aforementioned judgment, and assets totaling $1,919,500, with no set off for any money spent by Petitioner during or just after the CIR.
>
> Respondent may keep the balance of the assets, some of which may have been spent already, plus the proceeds from all of Respondent's businesses and interlocking shell LLC's from the inception of the CIR until present, subject to the payment of all taxes thereon.

CP at 338.

> The court reasoned:
>
> The law is clear that there is a presumption that assets acquired after the beginning of a CIR are presumed to be community-like unless the presumption is rebutted. Rebuttal is normally tracing the acquiring of the asset to separate bequests or rents or profits from assets that existed before the relationship.
>
> The court does not agree with Respondent's premise that even when there is a CIR, one examines community-like property to determine if each asset or item of value had contributions by the party not legally named as owner. Rather the principals of equity, avoiding unjust enrichment, are applied to the presumptive division of assets and debts acquired during the CIR.

CP at 336.

On August 7, Vaughn filed a motion for reconsideration. The trial court held a hearing on August 16 to review the court's findings and conclusions in the property division and consider Vaughn's motion for reconsideration. Throughout this hearing, the court repeated that it did not find Vaughn's testimony at trial credible. The court upheld the findings from its letter ruling but also stated it was entering findings of fact regarding the trial and property division. Regarding its decision to order default, the court explained:

> I can't imagine what other sanction I could have imposed because at every turn, Mr. Vaughn confused, omitted and was not credible. I had thought perhaps I would not find that to be the case, and that there would be enough to make a ruling on that the Court was confident represented all the assets brought in to being by this community-like partnership. But even after a full trial, that wasn't the case. . . .

> But I do think the first proper thing is to strike the pleadings, award the default, which is the amount requested by [Turner]. And if that's a wrong decision, we've had a trial and the evidence and credibility of the witnesses was judged and the amounts were figured based on that. That's the best the Court can do in a case like this.

> I do think there was significant prejudice to a less-economically affluent party to try to pay for the experts that would be necessary to sort through such an incomplete picture, and that significant prejudice is what enforces my ruling. And I don't know what a lesser – I mean, no lesser sanction has ever been proposed, so I can't imagine what that would have been.

VRP (Aug. 16, 2019) at 56-57.

That same day, the court issued a final order terminating the CIR. In it, the court specified that it awarded Vaughn any vehicles (except the one he stole) and all businesses, including Dank's Wonder Emporium, Original Investments, and "[a]ny other businesses in his control located in Washington, Oregon, California, Canada and New Jersey." CP at 395. The court also issued a final order and findings on Turner's motion for default and contempt of court, order to strike and attorney fees under CR 37. These two documents restated in greater detail the

division of property and findings from the court's July 3 letter ruling. The court again adopted the facts set forth in Turner's May 17 motion for default. The court also issued "Findings and Conclusions about a Committed Intimate Relationship," which contained 79 findings of fact regarding the relationship and Vaughn's business dealings.[8] The court found Vaughn intransigent in 14 separate findings. On September 11, the court issued an order denying Vaughn's motion for reconsideration nunc pro tunc to August 16, 2019.

Vaughn appeals.

ANALYSIS

Vaughn assigns error to the final order for default and raises 36 assignments of error pertaining to the trial court's Findings and Conclusions about a Committed Intimate Relationship. Br. of Appellant at 1-5. Vaughn argues that the trial court abused its discretion when it granted Turner's motion for default against him. Br. of Appellant at 5. He also argues that the trial court abused its discretion when it found Christine Morris's testimony that 60% of marijuana revenues were in cash was expert testimony. Br. of Appellant at 5. Finally, Vaughn argues that the trial court's division of property was neither just nor equitable. Br. of Appellant at 5. We hold that the trial court did not abuse its discretion and that the court's division of property was just and equitable.

---

[8] The court also issued a child support order. In it, the trial court imputed Vaughn's income based on Morris's testimony that 60% of her marijuana business was cash and accordingly added this amount to the income Vaughn accrued through the Square debit and credit card deposits. Vaughn assigns no error to the child support order but challenges the trial court's finding that Vaughn's marijuana collective brought in 60% of its revenue from cash.

54010-0-II

I. CHALLENGED FINDINGS OF FACT AND ABANDONED CONCLUSIONS OF LAW

In his 36 assignments of error, Vaughn challenges 37 of the trial court's findings of fact and 5 of its conclusions from the court's Findings and Conclusions about a Committed Intimate Relationship. Vaughn challenges findings 1-4, 6-9, 13, 14, 17-19, 23, 30, 31, 37, 48-51, 53, 58, 60-62, 65- 68, 70, 71, 73, and 75-78, and conclusions 5, 8, 9, 11, and 13. Each of his challenges fail.

We review a trial court's findings of fact following a bench trial to determine whether those findings are supported by substantial evidence. *In re G.W.-F.*, 170 Wn. App. 631, 637, 285 P.3d 208 (2012). Substantial evidence is that which is sufficient to persuade a fair-minded person of the truth of the premise. *In re Marriage of Condie*, 15 Wn. App. 2d 449, 459, 475 P.3d 993 (2020). Those findings supported by substantial evidence are verities on appeal. *Condie*, 15 Wn. App. 2d at 459. We defer to the trial court for resolution for conflicting testimony and credibility. *G.W.-F.*, 170 Wn. App. at 637. Unchallenged findings of fact are verities on appeal. *Rivers v. Wash. Conference of Mason Contractors*, 145 Wn.2d 674, 692, 41 P.3d 1175 (2002). Assignments of error to findings of fact that are not argued in a brief are abandoned on appeal. *In re Marriage of Glass*, 67 Wn. App. 378, 381 n.1, 835 P.2d 1054 (1992). We review conclusions of law de novo to determine if they are supported by the findings of fact. *G.W.-F.*, 170 Wn. App. at 637.

A.      *Findings of Fact*

Vaughn does not argue the errors he assigns to findings 4, 7, 14, 18, 23, 30, 31, 37, 38, 49, 50-51, 71, and 77-78. Because the errors assigned are not argued in his brief, they are

16

abandoned on appeal. *Marriage of Glass*, 67 Wn. App. at 381 n.1. The other findings that Vaughn challenges are all supported by substantial evidence.

Vaughn assigns error to findings 8, 9, and 17, where the trial court found that Vaughn brought in at least 40% of his revenue through credit and debit card payments alone and that he was therefore generating hundreds of thousands of dollars per months in revenue. Christine Morris, who ran a marijuana dispensary before she was bought out by Vaughn, testified that she operated the dispensary for more than two years and conservatively estimated 60% of her business was done in cash. Turner, whose name and social security number were tied to the bank account Vaughn's credit and debit sales went to, testified that by November 2015 Vaughn's marijuana ventures were generating more than $188,000 of revenue a month in debit and credit card sales alone. Extrapolating that the $188,000 of debit and credit revenue was therefore 40% of Vaughn's typical monthly revenue, substantial evidence supports the trial court's finding that the total revenue from Vaughn's businesses totaled in the hundreds of thousands of dollars per month.

Next, Vaughn assigns error to finding 13, where the trial court found that Vaughn was in continual application for a retail marijuana license from 2013 through 2016. In November 2013, Vaughn created Dank's Wonder Emporium, a sole-member LLC of which Vaughn was the only member, as the business entity to enter Washington's recreational marijuana market. Although Vaughn testified that Dank's was "defunct" at some point in 2014 or 2015 because he had not paid renewal fees, the Washington Secretary of State listed that the LLC had been in perpetual existence since March 2014. Moreover, testimony at trial showed that Vaughn repeatedly applied for a recreational cannabis license under the Dank's name in 2013, 2014, 2015, and

2016. Dank's Wonder Emporium eventually received a recreational marijuana license from the Washington Liquor and Cannabis Board 2016. Dank's Wonder Emporium was a cash-only business located at 6906 Martin Way East, in Lacey. Thus, there is substantial evidence to support the trial court's finding of fact 13.

Vaughn then assigns error to finding 19, where the trial court found that Turner removed, on average, $9,140 per month from the Square funds that were deposited in the parties' joint account. But in his brief, Vaughn admits that Turner testified to this herself. Thus, substantial evidence supports the trial court's finding.

Later, Vaughn assigns error to finding 53, where the trial court found that Vaughn's statement that he owned no part of the Dank's Wonder Emporium location in Edmonds not credible. We do not review a trial court's credibility determinations. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017).

In his challenge to findings 61-62 and 68, Vaughn assigns error to the court's findings that Turner took substantial steps to assist Vaughn in his business ventures or contributed to their relationship during the CIR, including caring for their child. Vaughn argues that "Turner spent all of her time pursuing her career," but concedes in the same paragraph that "[s]he also stayed home and cared for their first son . . . for two years." Brief of Appellant (Br. of Appellant) at 52. Vaughn also set up his federally-illegal marijuana proceeds to be processed through Turner's name and social security number because Square would no longer authorize Vaughn's use of their service for illegal means. The couple also eventually had a second child. *Turner* I at 4. Substantial evidence therefore supports the court's finding that Turner contributed to the relationship and the businesses.

18

Finally, Vaughn challenges findings 65-67, where the court found Vaughn's income to be $150,000 per month, and found that all of Vaughn's cannabis-related businesses were community-like and should be divided equitably. Specifically, Vaughn argues that the court awarded Turner all the assets and left him with "nothing but the debt." Br. of Appellant at 48. But the court awarded Vaughn all businesses, including Dank's Wonder Emporium, Original Investments, and "[a]ny other businesses in his control located in Washington, Oregon, California, Canada and New Jersey," and all the vehicles (except the one he stole). CP at 395. Vaughn's argument therefore fails and the court's finding is supported by substantial evidence in the record.

Vaughn's challenges to findings 1-3 and 58 are analyzed in Part II: Default and Sanctions. His challenges to findings 6, 8, 48, 70, and 73 are analyzed in Part III: Expert Testimony; and his challenges to findings 60, 75, and 76 are analyzed in Part IV: Division of Assets.

The court's remaining findings of fact were unchallenged, and are therefore verities on appeal.

B.      *Abandoned Conclusions of Law*

Vaughn assigns error to the trial court's conclusions of law 5, 11, and 36, but does not argue them in his brief. Thus, Vaughn has abandoned these challenges and we do not consider them.

## II.  DEFAULT AND SANCTIONS

Vaughn argues that the trial court abused its discretion when it granted Turner's motion for default, excluded Vaughn's testimony and that of his witnesses, exhibits, and claims, and

struck Vaughn's pleadings. Specifically, Vaughn argues that the trial court failed to meet the requirements for sanctions under CR 37 our Supreme Court set forth in *Burnet*. We disagree.

A.     *Legal Principles*

"Trial court decisions in dissolution proceedings will seldom be changed on appeal." *In re Marriage of Stenshoel*, 72 Wn. App. 800, 803, 866 P.2d 635 (1993). We give the trial court wide latitude to determine appropriate sanctions and recognize that the trial court is in the better position to determine the issue. *Smith v. Behr Process Corp.*, 113 Wn. App. 306, 324, 54 P.3d 665 (2002). However, a trial court's discretion to impose harsh sanctions for discovery violations is constrained by considerations set forth in *Burnet* and its progeny. *Jones v. City of Seattle*, 179 Wn.2d 322, 338, 314 P.3d 380 (2013). When a trial court imposes harsh sanctions under CR 37(b), it must be apparent in the record that "(1) the party's refusal to obey the discovery order was willful or deliberate, (2) the party's actions substantially prejudiced the opponent's ability to prepare for trial, and (3) the trial court explicitly considered whether a lesser sanction would probably have sufficed." *Rivers*, 145 Wn.2d at 686 (quoting *Burnet*, 131 Wn.2d at 494).

CR 37 (b)(2) provides, in pertinent part:

If a party . . . fails to obey an order to provide or permit discovery, including an order made under section (a) of this rule or rule 35, or if a party fails to obey an order entered under rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

. . .

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting the disobedient party from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceedings or any part thereof, or rendering a judgment by default against the disobedient party.

B.     Burnet *Analysis*

As stated above, when a trial court imposes a harsh remedy under CR 37 (b), it must be apparent in the record that "(1) the party's refusal to obey the discovery order was willful or deliberate, (2) the party's actions substantially prejudiced the opponent's ability to prepare for trial, and (3) the trial court explicitly considered whether a lesser sanction would probably have sufficed." *Rivers*, 145 Wn.2d at 686 (quoting *Burnet*, 131 Wn.2d at 494). Harsher sanctions include ordering pleadings be struck and a trial by default. *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 687, 132 P.3d 115 (2006).

1.    *Willfulness*

For discovery violations, willfulness means "'without reasonable excuse.'" *Smith*, 113 Wn. App. at 327 (quoting *Rivers*, 145 Wn.2d at 687). Here, the trial court imposed discovery sanctions "based upon [Vaughn's] intentional nondisclosure, willful violation of court order, and intentional failure to respond to discovery requests throughout the lawsuit." CP at 336.

In its findings of fact about the CIR, the trial court found Vaughn intentionally failed to provide a record of the cash deposits for his businesses, and disclosed only the credit card income received through Square. The court further found Vaughn intentionally failed to keep a cash receipts journal and other business records. Moreover, the court found that Vaughn "intentionally and in bad faith" violated the court order enjoining him from removing monies from the couple's account. CP at 363. The court made similar findings that Vaughn intentionally failed to comply with court orders to pay Turner draws, child support, and daycare

21

costs until faced with incarceration, refused to notify Turner of the extraordinary expenditures he spent on the 6906 Martin Way property and 1402 West Reynolds property, and stole Turner's car.

The record on appeal supports these findings. Moreover, Vaughn had a history of defying court orders in this case. He refused to pay Turner draws, he refused to pay for daycare, and he failed to inform the court that he had removed over $1,000,000 from a bank account. He stole Turner's car and sold it to his girlfriend for $10. Vaughn continued to violate court orders and complied only when he faced incarceration. He continuously showed he was unwilling to abide by court directives. We conclude that it is apparent in this record that Vaughn's refusal to obey the discovery order was willful. Vaughn's threadbare argument to the contrary fails.

2. *Substantial Prejudice*

Vaughn never disclosed the purchases, documents, or bank records related to 6909 Martin Way East, LLC, 1402 West Reynolds, LLC, or their associated properties to Turner. He did not disclose the corporate entity he created in Canada, his business interests in California or New Jersey, or his efforts to franchise Dank's Wonder Emporium. He provided no financial records for any of these entities.

Moreover, Vaughn did not present to the trial court any cash receipts from any of his marijuana businesses, leaving the trial court to rely only on income Vaughn and his businesses received through debit and credit purchases. Vaughn's cash earnings and income from providing services to other marijuana stores was not reflected on any of his tax return documents.

At the August 16, 2019, hearing on Turner's motion, the trial court explained that it found prejudice because of the paucity of financial information Vaughn disclosed, "I do think

22

there was significant prejudice to a less-economically affluent party to try to pay for the experts that would be necessary to sort through such an incomplete picture, and that significant prejudice is what enforces my ruling." VRP (Aug. 16, 2019) at 57.

Vaughn's argument that Turner did not suffer any prejudice in preparing for a trial dividing community-like property from Vaughn's lack of disclosure consists mainly of rhetorical questions and lacks merit. Vaughn appears to argue that Turner, being less-economically affluent, would not have been in a better position even if she had any records because of their purported complexity. But that is not the standard. The standard is whether the trial court abused its discretion in determining that one party was prejudiced. It is axiomatic that the failure to disclose significant assets and financial information in an action to equitably divide assets is prejudicial, and Vaughn's arguments to the contrary are preposterous.

### 3. *Alternative Sanctions*

Vaughn argues that the trial court did not consider any alternative or lesser sanction and why that sanction would be inadequate. He contends that he argued below that the alternative would be *no* sanctions. Vaughn argues that the trial court's decision "appears to be on information that the Court wanted to make a decision, not on what if any prejudice to Ms. Turner suffered as a result of any discovery violation." Br. of Appellant at 34. But the trial court did consider the possibility of a lesser sanction, stated its reasons against one, and clearly articulated how Turner was prejudiced by Vaughn's lack of disclosure.

The trial court explained its reasoning in its letter ruling: "These actions are the least restrictive in this case as it is impossible to set child support or equitably divide community-like property in a CIR where the only party with knowledge refuses to disclose financial information

23

the court requires to make a decision." CP at 335. It restated its reasoning at the August 16 hearing:

> I can't imagine what other sanction I could have imposed because at every turn, Mr. Vaughn confused, omitted and was not credible. I had thought perhaps I would not find that to be the case, and that there would be enough to make a ruling on that the Court was confident represented all the assets brought in to being by this community-like partnership. But even after a full trial, that wasn't the case. . . .

VRP (Aug. 16, 2019) at 56.

As explained above, Vaughn never disclosed the full extent of his business dealings and cash holdings. Turner first filed the motion for default on May 17, 2019. Knowing the default motion was pending, Vaughn could have produced the requested information and fully disclosed or presented the extent of his cash holdings during trial, but he did not. The trial court could have granted Turner's motion for default without proceeding to trial. Instead, the court conducted a full trial and gave Vaughn every opportunity to present evidence and witnesses, but found him repeatedly intransigent and lacking in credibility. Thus, we conclude that the trial court properly considered alternative sanctions before entering the final order of default and striking Vaughn's pleadings.

We hold that the trial court did not abuse its discretion when it entered the order holding Vaughn in default.

### III. FINDING OF EXPERT TESTIMONY

Vaughn argues that the trial court abused its discretion when it considered Christina Morris's testimony as expert testimony even though neither party requested to qualify her as an expert. He argues that Morris does not qualify as an expert under ER 702 and that the court was in error by relying on her testimony to infer 60% of Vaughn's income was cash. We disagree.

"This court reviews ER 702 challenges for abuse of discretion." *Watness v. City of Seattle*, 11 Wn. App. 2d 722, 749, 457 P.3d 1177, *review denied sub nom. City of Seattle v. Koehler*, 195 Wn.2d 1019, 464 P.3d 205 (2020). "Expert testimony satisfies ER 702 if (1) 'the witness qualifies as an expert,' and (2) 'the testimony will assist the trier of fact.'" *L.M. ex rel. Dussault v. Hamilton*, 193 Wn.2d 113, 134, 436 P.3d 803 (2019) (quoting *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918, 296 P.3d 860 (2013)). We will not generally disturb the trial court's discretion to admit expert evidence "except for a very plain abuse thereof." *Katare v. Katare*, 175 Wn.2d 23, 38, 283 P.3d 546 (2012) (quoting *Hill v. C & E Constr. Co.*, 59 Wn.2d 743, 746, 370 P.2d 255 (1962)). We will overturn a trial court's decision only if the trial court issued manifestly unreasonable rulings or those based on untenable grounds. *L.M.*, 193 Wn.2d at 134. We must be "convinced that no reasonable person would take the view adopted by the trial court." *L.M.*, 193 Wn.2d at 135 (quoting *Gilmore v. Jefferson Cnty. Pub. Transp. Benefit Area*, 190 Wn.2d 483, 494, 415 P.3d 212 (2018)).

ER 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Our courts have repeatedly held that practical experience is sufficient to qualify a witness as an expert. *Acord v. Pettit*, 174 Wn. App. 95, 111, 302 P.3d 1265 (2013); *State v. Weaville*, 162 Wn. App. 801, 824, 256 P.3d 426 (2011); *State v. McPherson*, 111 Wn. App. 747, 762, 46 P.3d 284 (2002) (explaining an expert witness does not have to be "a rocket scientist" to qualify as an expert).

Here, the trial court found that Morris qualified as an "expert by experience." CP at 369. Morris had more than two years' experience owning and operating a marijuana dispensary. Thus, Morris had practical experience in the marijuana industry. The testimony assisted the trial court in determining Vaughn's income—which the court imputed—because Vaughn did not disclose his cash earnings. Accordingly, Morris's testimony satisfies ER 702.

Vaughn compares this case to *Katare*, where an attorney by profession who had 17 years of handling abduction cases was qualified as an expert by experience. 175 Wn.2d at 38-39. He contrasts this with Morris's two years of experience in the marijuana industry. But there is no minimum time requirement for the practical experience needed to qualify as an expert. Vaughn also argues that Morris's medical marijuana collective earned 60% of her sales in cash, not Vaughn's. But this ignores that Morris sold her entire business to Vaughn. From these facts, a reasonable person could conclude that 60% of Vaughn's marijuana business was conducted in cash.

Vaughn also argues that Morris's testimony was insufficient to impute that only 40% of Vaughn's income was from the Square receipts and that the rest of his income was undisclosed cash. But this ignores that the trial court's reliance on Morris's testimony likely benefited Vaughn. In Vaughn's opening brief, he admits that the rest of the record shows that cash forms a greater percentage of marijuana business than Morris stated. Vaughn admitted that the majority of marijuana purchases were cash. Dank's Wonder Emporium was *entirely* cash-based and Drury, an accounting expert with experience in the marijuana industry, stated that retail marijuana sales have to be in cash. Two other witnesses with experience in the industry stated that the marijuana industry is substantially cash based. Thus, the record supports the trial court's

26

finding that 60% of Vaughn's income from marijuana sales were in cash and the trial court did not abuse its discretion.

## IV. DIVISION OF ASSETS FOLLOWING TERMINATION OF CIR

Vaughn argues that the trial court's division of assets was neither just nor equitable.[9] We disagree.

We reverse a property division made during dissolution only if there is a manifest abuse of discretion. *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). "'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.'" *Muhammad*, 153 Wn.2d at 803 (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)). We look to guidance in dividing property following a CIR from RCW 26.09.080, which "does not mandate an equal division of property. Rather, it requires a 'just and equitable' division." *In re Marriage of Martin*, 22 Wn. App. 295, 298, 588 P.2d 1235 (1979).

> Under RCW 26.09.080, the court's division
>
> shall appear just and equitable after considering all relevant factors including, but not limited to:
> (1) The nature and extent of the community property;
> (2) The nature and extent of the separate property;
> (3) The duration of the marriage or domestic partnership; and

---

[9] Vaughn also argues that the trial court erred because its division was based on the "assumption" that Vaughn must have more cash because of the amounts the record showed he earned from credit and debit card sales alone. This argument fails for two reasons. First, as explained above, witnesses Drury, Espinda, Morris, and one more of Vaughn's witnesses with experience in the marijuana industry, all testified that it is substantially a cash industry. Second, Vaughn had every opportunity throughout the trial to present evidence of his businesses' records but instead did not provide any beyond the Square receipts. Indeed, as noted above, the trial court found Vaughn intentionally failed to provide a record of the cash deposits for his businesses, and disclosed only the credit card income received through Square.

(4) The economic circumstances of each spouse or domestic partner at the time the division of property is to become effective.

We look to the structure of wholly owned corporate entities to ensure a fair division of assets in a dissolution proceeding. *Palomarez v. Wilcox*, 15 Wn. App. 2d 187, 192, 475 P.3d 512 (2020). Where a business has a sole owner, we consider the business's earnings as the owner's income, absent a legitimate business need to retain the earnings. *Palomarez*, 15 Wn. App. 2d at 192.

> The burden is on the business owner to demonstrate that retained earnings are solely maintained for the business. However, it is not an abuse of discretion for the trial court to use the amount of money drawn by the community to calculate income if that value reflects the parties' income and living conditions predissolution.

*Palomarez*, 15 Wn. App. 2d at 192 (citing *In re Marriage of Stenshoel*, 17 Wn. App. at 806-07).

Here, the trial court explained its reasoning when it divided the property, and its decision aligns with the factors in RCW 26.09.080. The court explained the rebuttable presumption that assets acquired after the beginning of the CIR are presumed community-like. It listed out the community-like and separate property. The court clearly laid out the length of the CIR. Finally, the court considered the parties' economic circumstances, explaining, "I do think there was significant prejudice to a less-economically affluent party to try to pay for the experts that would be necessary to sort through such an incomplete picture, and that significant prejudice is what enforces my ruling." VRP (Aug. 16, 2019) at 57.

Vaughn managed a complex web of business entities that are wholly owned by one another and trace back to Vaughn's sole ownership. Vaughn claimed sole ownership of Pacific Green Collective. He is the sole member and owner of Dank's Wonder Emporium, LLC. He is the sole member and owner of Original Investments, LLC, which in turn is the sole-member of

6909 Martin Way East, LLC, and owner of the property at the same address which houses Dank's Wonder Emporium. Vaughn is the sole-member and owner of 1402 West Reynolds, LLC, and owner of the property at the same location. Both the 6909 Martin Way and the 1402 West Reynolds properties were purchased using money loaned to the same-named LLC entities from Pacific Green. The record shows other business holdings outside Washington as well.

Vaughn failed to disclose his full income or financial records, especially cash earnings, from any of these entities. Thus, it was impossible for the trial court to determine Vaughn's precise income from his numerous businesses.

Because of the paucity of information Vaughn presented to the trial court, the court was forced to impute Vaughn's income and assets when dividing assets and setting child support. To do so, the court looked to the available evidence. In 2015, the income from the debit and credit cards for Pacific Green totaled $2,227,463. Morris testified that this income accounted for only 40% of one of Vaughn's predecessor entities' earnings—the other 60% was cash. Taking this, plus the expansion in Vaughn's business holdings since 2015 as listed above, and how Dank's Wonder Emporium is cash-based, the trial court concluded that just "one of [Vaughn's] businesses continues to annually produce at least 4 million dollars in marijuana sales alone." CP at 338. Because Vaughn was the sole owner of these entities and because the record is incomplete due to his lack of disclosure, Vaughn fails to meet the burden to demonstrate that these retained earnings are solely maintained for the businesses.

Based on these conclusions, the trial court awarded Turner $625,000, plus $500,000 remaining in a trust account, the real estate at 6909 Martin Way East and 1402 West Reynolds, and the value of the car Vaughn stole. The court awarded Vaughn all businesses, including

Dank's Wonder Emporium, Original Investments, "[a]ny other businesses in his control located in Washington, Oregon, California, Canada and New Jersey," and any vehicles (except the one he stole). CP at 395. Thus, we conclude that the trial court divided the parties' assets fairly and equitably.

Vaughn appears to argue that Turner was not entitled to the division ordered by the court because she did not contribute to the CIR and therefore did not jointly own assets. Vaughn argues that "to equitably divide property there must be a pooling of resources in the assets." Br. of Appellant at 51. But Vaughn applies the wrong standard: he cites to cases which lay out the factors for determining whether or not a CIR exists, not whether the trial court equitably divided assets. Indeed, we already determined that a CIR existed between Vaughn and Turner in *Turner* I at 6, 15. Accordingly, we hold that the trial court did not abuse its discretion when it divided the assets.

## ATTORNEY FEES ON APPEAL

Turner argues that she is entitled to attorney fees on appeal under CR 37, for Vaughn's intransigence and because Vaughn's appeal is frivolous. Vaughn argues that we should award him attorney fees because Turner raises irrelevant arguments. We agree with Turner and award her attorney fees because Vaughn's appeal is frivolous.

### I. TURNER'S CLAIM

Turner argues that we should award her attorney fees on appeal under RAP 18.9 because Vaughn's appeal was frivolous. We agree.

"RAP 18.9 authorizes us to award sanctions against a party who uses the Rules of Appellate Procedure for the purposes of delay, files a frivolous appeal, or fails to comply with

the Rules of Appellate Procedure." *Schorno v. Kannada*, 167 Wn. App. 895, 904, 276 P.3d 319

(2012).

> In determining whether an appeal is frivolous and was, therefore, brought for the purpose of delay, justifying the imposition of terms and compensatory damages, we are guided by the following considerations: (1) A civil appellant has a right to appeal under RAP 2.2; (2) all doubts as to whether the appeal is frivolous should be resolved in favor of the appellant; (3) the record should be considered as a whole; (4) an appeal that is affirmed simply because the arguments are rejected is not frivolous; (5) an appeal is frivolous if there are no debatable issues upon which reasonable minds might differ, and it is so totally devoid of merit that there was no reasonable possibility of reversal.

*Lee v. Kennard*, 176 Wn. App. 678, 692, 310 P.3d 845 (2013) (quoting *Tiffany Family Trust Corp. v. City of Kent*, 155 Wn.2d 225, 241, 119 P.3d 325 (2005) (internal quotation marks omitted).

Here, Turner prevails on appeal and each argument Vaughn raised was devoid of merit. As explained above, each of the trial court's findings were supported by substantial evidence and the trial court's thorough findings and conclusions left no debatable issues on which reasonable minds might differ. Accordingly, we award Turner attorney fees on appeal. Because we hold that Vaughn's appeal was frivolous, we do not reach Turner's request for fees on appeal under CR 37 and for intransigence.

## II. VAUGHN'S CLAIMS

Vaughn argues that he is entitled to attorney fees on appeal because Turner misstated the testimony of witnesses and cited irrelevant material in Part B of her brief.[10] We disagree for several reasons.

---

[10] Part B of Turner's brief responded to Vaughn's argument concerning expert testimony.

First, even assuming without deciding that Turner's argument in Part B of her brief was frivolous, there is no rule that allows us to award fees when *part* of a respondent's brief is frivolous. Second, although Part B of Turner's brief cites no law, Turner's argument accurately cites the record and is not totally devoid of merit, contrary to Vaughn's argument. Third, Vaughn makes no showing that Turner's brief fails to comply with the Rules of Appellate Procedure.[11] Accordingly, we do not award Vaughn attorney fees on appeal.

CONCLUSION

We hold that the trial court did not abuse its discretion when it ordered default, excluded Vaughn's testimony and witnesses' testimony, exhibits, and claims, and struck Vaughn's pleadings. Vaughn repeatedly failed to disclose the full extent of his business holdings and cash revenue and he was intransigent throughout trial. We also hold that the trial court did not abuse its discretion when it considered Morris's testimony as expert testimony based on her two years practical experience in the marijuana industry. The trial court fairly and equitably divided assets following termination of the CIR based on the evidence before it. Finally, we award Turner attorney fees on appeal because Vaughn's arguments were frivolous. Accordingly, we affirm.

---

[11] Respondents' briefs must conform to RAP 10.1(a) and answer the appellant's brief. RAP 10.1(b). Under RAP 10.7, where a brief fails to comply with RAP Title 10, we may "(1) order the brief returned for correction or replacement within a specified time, (2) order the brief stricken from the files with leave to file a new brief within a specified time, or (3) accept the brief." We will ordinarily impose sanctions on a party or counsel for a party who files a brief that fails to comply with RAP Title 10.

54010-0-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Lee, C.J.

Cruser, J.

33