**NOT DESIGNATED FOR PUBLICATION**

STATE OF LOUISIANA

COURT OF APPEAL
FIRST CIRCUIT

2023 CA 0595

ANGELLE FITCH AND MICHAEL FITCH, INDIVIDUALLY AND
ON BEHALF OF THEIR MINOR SON, ELIAS FITCH

VERSUS

DR. CHARON GENTILE, HEATHER FANGUY, N.P., AND
HOSPITAL SERVICE DISTRICT #1, PARISH OF TERREBONNE,
D/B/A TERREBONNE GENERAL MEDICAL CENTER

*DATE OF JUDGMENT:*     **MAR 0 5 2024**

ON APPEAL FROM THE THIRTY-SECOND JUDICIAL DISTRICT COURT
PARISH OF TERREBONNE, STATE OF LOUISIANA
NUMBER 187595, DIVISION B

HONORABLE JASON DAGATE, JUDGE

* * * * * *

Ravi K. Sangisetty
William Boyles
Parker N. Hutchinson
Amanda J. Olmstead
New Orleans, Louisiana

Counsel for Plaintiffs-Appellants
Angelle Fitch and Michael Fitch,
individually and on behalf of their
minor son, Elias Fitch

Nicholas Gachassin, III
John D. Schoonenberg
Barry J. Boudreaux
Lafayette, Louisiana

Counsel for Defendant-Appellee
Dr. Charon Gentile

H. Carson McKowen
Thibodaux, Louisiana

* * * * * *

BEFORE: GUIDRY, CJ, CHUTZ, AND LANIER, JJ.

**Disposition: AFFIRMED.**

**Chutz, J.**

Plaintiffs, Angelle and Michael Fitch, individually and on behalf of their minor son, Elias Fitch, appeal a district court judgment dismissing their medical malpractice claims against defendant, Dr. Charon Gentile, M.D. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Following a positive pregnancy test, Mrs. Fitch began prenatal care with her obstetrician/gynecologist (OBGYN), Dr. Gentile, on May 23, 2017. At Mrs. Fitch's scheduled appointment on the morning of December 27, an ultrasound revealed the baby (Elias), whose gestational age was 37 + 1 weeks at that point, was in a breech position. Due to potential complications, particularly Mrs. Fitch's elevated blood pressure, Dr. Gentile recommended she be admitted to Terrebonne General Medical Center (TGMC) for evaluation and monitoring. After Mrs. Fitch arrived at TGMC in the early afternoon, she was diagnosed by Dr. Gentile with preeclampsia, iron deficiency anemia, and breech presentation. Given the risk of complications, including the baby's breech position and the mother's obesity, Dr. Gentile recommended delivery of the baby be undertaken. She advised Mrs. Fitch of the options of either undergoing a version, a procedure attempting to manually reposition the baby's head to come first, which would allow a vaginal delivery, or to undergo a cesarean section delivery. Dr. Gentile advised Mrs. Fitch of the risks and benefits of each option. Mrs. Fitch declined a cesarean section and chose to undergo a version.

On the morning of December 28, a version repositioning the baby from a breech position was successfully completed. Thereafter, Pitocin was administered to Mrs. Fitch early in the afternoon to induce contractions. The following day, December 29, at approximately 2:00 p.m., Dr. Gentile artificially ruptured membranes (*i.e.*, breaking the water) in an attempt to progress Mrs. Fitch's labor. Sometime thereafter, Mrs. Fitch went into active labor. Because Dr. Gentile

2

considered Mrs. Fitch's delivery to be high risk, she was accompanied into the delivery room by three labor and delivery nurses.

At 10:23 p.m., the baby's head was delivered, and Dr. Gentile applied "standard" traction. Upon encountering resistance, Dr. Gentile diagnosed a shoulder dystocia, which occurs after a baby's head is delivered but the baby's shoulder is stuck behind the mother's pubic bone. Because cord compression limits the flow of blood and oxygen to the baby, shoulder dystocia is an emergency situation in which a physician has a limited period of time to deliver the baby without risk of brain injury or death.

Upon Dr. Gentile advising the nurses of the shoulder dystocia, one of the nurses activated the call button for additional assistance, and two more nurses rushed to the delivery room. Mrs. Fitch's bed was repositioned and the nurses made certain there were no obstructions. Dr. Gentile ordered the nurses to perform the McRoberts maneuver[1] and to apply suprapubic pressure[2] in an attempt to dislodge the baby's shoulder. Further, Dr. Gentile reduced the nuchal cord wrapped around the baby's neck and applied additional traction. When these maneuvers proved unsuccessful, Dr. Gentile performed an episiotomy and was able to insert her hand and deliver the baby's posterior shoulder and arm, after which the baby was able to be fully delivered. The baby (Elias) was purple, floppy, not moving, and making no attempt to breathe. Elias was assigned an Apgar score of two. He was immediately taken into the care of NICU staff, who treated him for respiratory distress and noted his left arm was not moving. The span of time from when Dr. Gentile encountered the shoulder dystocia to Elias' delivery was one minute and twenty seconds.

---

[1] The McRoberts maneuver consists of attempting to flex the mother's hips by pushing her knees or legs back toward her chest, thereby changing the angle of the pelvis to allow more space for the baby to be delivered.

[2] Suprapubic pressure consists of attempting to dislodge the baby by using a hand or fist to push down or apply pressure above the pubic bone trying to rotate the baby underneath the pubic symphysis to free the shoulder.

Elias remained in the NICU until his discharge on January 6, 2018. He was diagnosed with a brachial plexus[3] injury to his left arm resulting from birth trauma. As a result of his injury, Elias has only limited use of his left hand and arm.

On May 22, 2018, Elias was examined by Dr. Scott Kozin at Shriners Hospital in Philadelphia, Pennsylvania. Dr. Kozin categorized Elias' brachial plexus injury as a global injury, meaning he had "no movement whatsoever" of his left upper extremity, including his shoulder, elbow, forearm, wrist, and hand. The following day, Dr. Kozin performed nerve graft surgery on Elias, noting his C5 and C6 vertebrae were ruptured (torn) and his C7, C8, and T1 vertebrae were avulsed (nerve roots pulled from the spinal cord). Dr. Kozin continued to see Elias for follow-up visits. In his trial deposition, Dr. Kozin testified that although the surgery benefitted Elias to some extent, resulting in some nerve regeneration, he is nearing the end of any meaningful nerve regeneration, and his hand and arm function remain limited and will never be normal.

Plaintiffs filed a request for a medical review panel, and the panel rendered a unanimous opinion finding Dr. Gentile did not breach the applicable standard of care. Subsequently, on November 26, 2019, Plaintiffs filed a suit for damages alleging Dr. Gentile's breach of the standard of care, particularly by pulling on Elias' head with excessive force during delivery, caused his permanent brachial plexus injury.[4] A bench trial of this matter was held on August 22-25, 2022. At the

---

[3] The brachial plexus is a connection of nerves in part of the neck that conjoin to form the neural system for the arm. The brachial plexus controls the movements and sensations of the arm. The brachial plexus has five nerve roots (C5, C6, C7, C8, and T1), each of which principally relates to certain functions: C5 mainly controls movement of the shoulder; C6 mainly controls elbow bending, forearm supination (i.e., turning the palm up), and some wrist extension; C7 principally allows extension of the elbow, wrist, and fingers; C8 principally affects finger flexion such as making a fist; and T1 affects fine motor functions, such as those necessary for zipping and buttoning items.

[4] Plaintiffs also named TGMC and Heather Fanguy (Dr. Gentile's nurse practitioner) as defendants, but they were each subsequently dismissed, with prejudice, from this matter. The claims against TGMC were dismissed in a consent summary judgment in which the district court specifically stated it found that neither TGMC nor any of its employees, including its delivery

conclusion of proceedings on August 25, the trial court ordered the trial be resumed on September 30, 2022. When trial resumed on that date, the trial court heard closing arguments on behalf of the parties. The trial court then rendered judgment in favor of Dr. Gentile.

In support of its judgment, the trial court gave extensive oral reasons for judgment totaling 26 pages once transcribed. The trial court accepted Dr. Gentile's testimony that she did not apply excessive or downward traction to Elias' head during delivery. Further, the trial court accepted the testimony of Dr. Gentile and her defense expert, Dr. Allan Tencer, over that of plaintiffs' experts who testified the only logical explanation for Elias' injury was excessive downward lateral traction applied by Dr. Gentile. On October 27, 2022, the trial court signed a written judgment dismissing plaintiffs' suit against Dr. Gentile, with prejudice. Plaintiffs now appeal, raising five assignments of error.

## ASSIGNMENTS OF ERROR

1. The trial court erred in allowing the expert testimony of Dr. Tencer because he was unqualified to offer an opinion as to birth injuries, and he failed to apply the relevant methods and principles to the facts of this case.

2. The trial court erred in allowing Dr. Tencer to testify beyond the scope of his expert report.

3. The trial court failed to accurately consider the applicable medical science, particularly the expert testimony of Dr. Scott Kozin.

4. The trial court erred in allowing defendant, Dr. Gentile, to offer opinions relating to causation of Elias' injuries when she was unqualified to do so.

5. The trial court erred in assessing the credibility of witnesses.

---

room nurses, were at fault or caused or contributed to Elias' injuries. On plaintiffs' motion, Ms. Fanguy was also dismissed, with prejudice, from this matter.

## DR. TENCER'S EXPERT TESTIMONY
(Assignments of Error Numbers One & Two)

Assignment of Error Number One:

Plaintiffs filed a ***Daubert*[5]** motion to exclude the testimony of defense expert, Dr. Tencer, a biomechanical engineer. Dr. Gentile offered Dr. Tencer as an expert in biomechanics, as well as the biomechanics of childbirth, in particular with respect to the tensile strength of the spine and exogenous (external) and endogenous (internal) forces. Plaintiffs argue Dr. Tencer is unqualified to testify as an expert in this case because: he is an accident reconstructionist who has now begun to offer opinions related to birth injuries; the instant case is only the third case Dr. Tencer has participated in involving a shoulder dystocia and brachial plexus injury; his testimony is not related to any research he has conducted in this specific area other than the reading of relevant medical literature; and he performed no testing or analysis in this case. The trial court overruled plaintiffs' objections and denied the motion to exclude Dr. Tencer's testimony with one caveat. Specifically, the trial court held that while Dr. Tencer could testify as to alternate theories of causation of brachial plexus injuries during the birth process other than excessive traction, he could not testify as to the specific causation of Elias' injuries.

The United States Supreme Court established the standard for determining the admissibility of expert testimony in ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This standard is codified in La. C.E. art. 702. ***Lee v. Louisiana Board of Trustees for State Colleges***, 17-1433 (La. App. 1st Cir. 3/13/19), 280 So.3d 176, 186, writ denied, 19-01647 (La. 1/14/20), 291 So.3d 690. Article 702 provides, in pertinent part:

> A. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[5] ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

6

(1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) The testimony is based on sufficient facts or data;

(3) The testimony is the product of reliable principles and methods; and

(4) The expert has reliably applied the principles and methods to the facts of the case.

To ensure reliability, the expert's opinions must be grounded in methods and procedures of science, rather than subjective belief or unsupported speculation. Before admitting expert testimony, the court must make a preliminary assessment that the reasoning or methodology underlying the testimony is scientifically valid and can be applied to the facts at issue. *Thompson v. Transocean Offshore Deepwater Drilling, Inc.*, 19-0440 (La. App. 1st Cir. 2/21/20), 293 So.3d 80, 86, writ denied, 20-00802 (La. 10/14/20), 302 So.3d 1115.

The following illustrative considerations may be used to determine whether the reasoning and methodology underlying expert testimony is scientifically valid and can properly be applied to the facts at issue: (1) whether the expert's theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error; and (4) whether the methodology is generally accepted in the scientific community. *Thompson*, 293 So.3d at 86. However, the ultimate determination of the admissibility of expert testimony under Article 702 turns upon whether it would assist the trier of fact to understand the evidence or to determine a fact at issue. The decision to admit or exclude expert testimony is within the sound discretion of the trial court, and its judgment will not be disturbed by an appellate court unless it is clearly erroneous. *Thompson*, 293 So.3d at 86.

The record reveals Dr. Tencer has a PhD in biomechanical engineering. His dissertation, which was published in a peer-reviewed engineering journal, was a

7

detailed study of the anatomical and mechanical properties of the human lumbar spine. For over thirty years, Dr. Tencer was employed as either an assistant or full professor in the orthopedic surgery departments of the medical schools at the University of Texas and the University of Washington. During this period, he conducted research and multiple studies on various topics, including studies on various aspects of the human spine, including the cervical spine. Dr. Tencer has been either the lead or co-author of over 100 papers on various topics published in peer-reviewed biomechanical and medical journals. He was the lead author on a published paper resulting from studies on the tensile strength of spinal nerve roots that focused on the mechanical properties of the spinal cord and its nerve roots, especially the type of material they were made of and the amount of force required to break them.

Dr. Tencer has testified as an expert in the field of biomechanical engineering numerous times. Additionally, in a case in Washington in which an infant, like Elias, suffered a birth injury to his brachial plexus involving avulsions and ruptures to all five brachial plexus nerves, Dr. Tencer was permitted to testify as an expert regarding the biomechanical forces of labor. Specifically, he was allowed to testify as to the levels of external (exogenous) and internal (endogenous) forces involved in the birth process, *i.e.*, the natural [maternal] forces of labor theory of causation.[6] See *L.M. by & through Dussault v. Hamilton*, 200 Wash. App. 535, 540 & 556, 402 P.3d 870, 874 & 881 (2017), affirmed, 193 Wash.2d 113, 436 P.3d 803 (2019).

Based on our review of the record, we find no error in the admission of Dr. Tencer's expert testimony. Dr. Tencer has extensive training and experience and has conducted multiple studies in medical settings regarding injuries to the spinal

---

[6] As in the present case, while Dr. Tencer was accepted by the trial court in the Washington case as an expert biomechanical engineer and was permitted to testify as to the natural forces of labor theory, he was precluded in that case from testifying as to specific causation. See *L.M. by & through Dussault v. Hamilton*, 200 Wash. App. 535, 540 & 556, 402 P.3d 870, 874 & 882 (2017), affirmed, 193 Wash.2d 113, 436 P.3d 803 (2019).

8

cord and nerve roots, as well as the forces necessary to cause them. As the trial court indicated in overruling plaintiffs' objections, the arguments raised by plaintiffs go more to the weight of Dr. Tencer's opinions rather than to the reliability of his opinions.

We also find no merit in plaintiffs' argument that Dr. Tencer's testimony should have been excluded because he failed to meet the necessary qualifications set forth by the Louisiana Supreme Court in order for an expert to testify on causation of brachial plexus injuries during childbirth. Plaintiffs base this argument on the holding of *LaBauve v. Louisiana Medical Mutual Ins. Co.*, 21-00763 (La. 4/13/22), 347 So.3d 724 (*per curiam*), which like the instant case involved a permanent birth injury to a child's brachial plexus. In *LaBauve*, the trial court allowed Dr. Michele Grimm to testify as a defense expert in biomedical engineering and brachial plexus injuries. At trial, Dr. Grimm opined that the child's brachial plexus injury, which involved all five of the child's brachial plexus nerve roots being "completely and partially avulsed (removed) from the spinal cord," was caused by "maternal forces of labor." *LaBauve*, 347 So.3d at 727, 730. The Third Circuit reversed the trial court's ruling on Dr. Grimm's qualifications as an expert. Upon review, the Louisiana Supreme Court concluded the Third Circuit erred and reversed its decision. *LaBauve*, 347 So.3d at 730-32.

In determining Dr. Grimm was qualified to give expert testimony, the *LaBauve* Court listed a number of Dr. Grimm's qualifications.[7] Relying on this list of qualifications, plaintiffs argue *LaBauve* "set a sort of floor" that experts must

---

[7] In particular, the *LaBauve* Court noted Dr. Grimm published two papers in 2003, one of which comprised her opinions in the case; she developed a computer model to study human injuries during crashes; she revised and adapted the computer model to study the stretch of the nerves of the brachial plexus during the birth process and to determine the likely cause of injury; she has published papers on brachial plexus injuries in peer-reviewed obstetrical journals, in peer-reviewed engineering journals, and in an engineering textbook; and she was part of a group commissioned by the American College of Obstetricians and Gynecologists to study the effect of maternal forces of labor on brachial plexus injuries. *LaBauve*, 347 So.3d at 730-31.

meet in order to render opinions regarding brachial plexus injuries occurring during childbirth. We disagree. In *LaBauve*, the Louisiana Supreme Court merely discussed the specific qualifications supporting the trial court's determination in that case. The opinion in no way suggested those particular qualifications were necessary in order for an expert to testify regarding brachial plexus injuries occurring during childbirth.

Assignment of Error Number Two:

In addition to challenging Dr. Tencer's qualifications to testify as an expert, plaintiffs argue the trial court erred in allowing him to testify beyond the scope of his two expert reports. The pretrial order in this case required the parties to provide a written report prepared by any expert who was to testify at trial. The expert report was "to contain a complete statement of all opinions to be expressed and the bases and reasons [therefor] and the data or other information considered by the witness in forming the opinions." See La. C.C.P. art. 1425(B). Plaintiffs allege Dr. Tencer was allowed to use demonstrative aids and to testify about specific force calculations, which were not included in either of his expert reports.[8]

Dr. Tencer was retained by the defense specifically to review the expert opinions of Dr. Robert Allen, a biomedical engineer retained by plaintiffs, including Dr. Allen's opinion that Elias' injuries could only have been caused by excessive

---

[8] Plaintiffs also complain in brief that Dr. Tencer was permitted to testify regarding anatomical variations and publications he relied on, which was not information included in his expert reports. We note Dr. Tencer's brief reference at trial to anatomical variations was part of his testimony regarding the amount of force necessary to cause nerve damage and the nerve tensile strength of infants during delivery. Such testimony arguably falls within the broad topic of possible alternate explanations for Elias' brachial plexus injuries, which was a topic included in Dr. Tencer's expert reports. Further, plaintiffs failed to point out any specific publication not included in Dr. Tencer's expert reports that he relied on and referenced in his testimony. Regardless, we need not reach these issues because plaintiffs failed to make a contemporaneous objection either to Dr. Tencer's testimony regarding anatomical variations or referring to any publication not included in his two expert reports. By failing to make a contemporaneous objection to this testimony, plaintiffs failed to preserve the issues for appellate review. See La. C.E. art. 103A(1); *St. Philip v. Montalbano*, 16-0254 (La. App. 1st Cir. 10/31/16), 206 So.3d 909, 913-14, writ denied, 16-2110 (La. 1/13/17), 215 So.3d 255.

downward and lateral traction eight to nine times the average traction used during delivery (*i.e.*, 40-45 pounds). Dr. Tencer's expert reports questioned the reliability of Dr. Allen's expert report on the basis that he provided no objective measurements or data to support his opinions and ignored authoritative studies indicating excessive traction is not the exclusive cause of birth-related brachial plexus injuries. He opined that Dr. Allen's calculation of the amount of force/traction used was not credible.

During his trial testimony, Dr. Tencer used a poster he prepared as an aid to illustrate his disagreement with the methodology employed by Dr. Allen in calculating the amount of force used by Dr. Gentile. Plaintiffs objected to the use of the poster because it was not included in Dr. Tencer's expert reports. On the same basis, plaintiffs also objected to Dr. Tencer's use of a load meter/crane scale to physically demonstrate how much exertion was required to reach the amount of force Dr. Allen believed Dr. Gentile exerted on Elias during delivery (*i.e.*, 40 pounds).

After questioning the parties concerning the contents of Dr. Tencer's expert reports, the trial court overruled both objections. Regarding the poster relating to Dr. Allen's methodology in calculating the force exerted, the trial court stated it believed Dr. Tencer was entitled to explain how he reached his conclusions and why he believed his opinion was more credible than that of Dr. Allen. The trial court further noted plaintiffs would have an opportunity on cross-examination to address their concerns about the poster. As to Dr. Tencer's demonstration with the load meter/crane scale, the trial court noted Dr. Tencer was testifying as an expert and it was customary for experts to use demonstrations to explain their opinions and how they reached their conclusions.

A trial court has great discretion in deciding whether to receive or refuse evidence objected to on the grounds of failure to abide by a pretrial order. Further, any doubt should be resolved in favor of receiving the information. See *Palace Properties, L.L.C. v. Sizeler Hammond Square Ltd. Partnership*, 01-2812 (La.

11

App. 1st Cir. 12/30/02), 839 So.2d 82, 91, writ denied, 03-0306 (La. 4/4/03), 840 So.2d 1219; *Curry v. Johnson*, 590 So.2d 1213, 1216 (La. App. 1st Cir. 1991). Absent an abuse of discretion, the trial court's decision whether to admit or exclude evidence upon objection on the grounds of failure to abide by the pre-trial order will be upheld. *Cobena v. ACE American Insurance Company*, 21-630 (La. App. 5th Cir. 8/3/22), 347 So.3d 1117, 1125-26, writ denied, 22-01337 (La. 11/16/22), 349 So.3d 1007.

We find no abuse of discretion in the trial court's evidentiary rulings in this case. Plaintiffs were well aware from Dr. Tencer's two expert reports of his opinion that Dr. Allen's force calculations were flawed and not credible. At trial, Dr. Tencer merely used the poster and load meter/crane scale as aids to demonstrate and explain his disagreement with Dr. Allen's opinions.

DR. GENTILE'S TESTIMONY
(Assignment of Error Number Four)

Plaintiffs argue the trial court erred in allowing Dr. Gentile to give testimony going directly to the issue of causation and the effects of force on objects, criticizing a birthing simulator device patented by plaintiffs' expert, Dr. Allen, and commenting on a report commissioned by the American College of Obstetricians and Gynecologists to study the effect of maternal forces of labor on brachial plexus injuries (the ACOG report). Plaintiffs contend Dr. Gentile was not qualified to testify on these matters because she was accepted as an expert in the field of obstetrics and gynecology and the management of shoulder dystocia, rather than in the field of biomedical engineering.

Prior to trial, plaintiffs filed a motion to exclude the testimony of Dr. Gentile on the issue of causation. In denying the motion, the trial court stated:

> [W]ell, I mean it's an injury that's alleged to happen during the course of her rendering her care to deliver a baby, so I would expect that she would know how certain injuries are caused so that she would be able

12

to prevent them from occurring. So I'm going to deny the motion as to Doctor Gentile.

At trial, plaintiffs objected to Dr. Gentile's testimony concerning Dr. Allen's birth simulator device on the grounds that Dr. Gentile was not offered as an expert in biomechanical engineering. In overruling the objection, the trial court stated: "I don't feel it goes to her opinion as a biomechanical one as opposed to[,] I think it still falls within the field that she is qualified in as an OBGYN."

A trial court is granted broad discretion in its evidentiary rulings. *Travis v. Spitale's Bar, Inc.*, 12-1366 (La. App. 1st Cir. 8/14/13), 122 So.3d 1118, 1126, writs denied, 13-2409, 13-2447 (La.1/10/14), 130 So.3d 327 & 329. The standard of review for a trial court's evidentiary ruling is abuse of discretion. The trial court's ruling will not be disturbed on appeal unless it is clearly erroneous. *Gorman v. Miller*, 12-0412 (La. App. 1st Cir. 11/13/13), 136 So.3d 834, 840, writ denied, 13-2909 (La. 3/21/14), 135 So.3d 620.

In this case, we agree with the trial court's reasoning that the complained of testimony of Dr. Gentile relating to brachial plexus birth injuries and the forces and pressures exerted during child birth were matters clearly within the field of obstetrics and gynecology. Likewise, the ACOG report on brachial plexus birth injuries, which plaintiffs assert Dr. Gentile was unqualified to comment upon, was a report issued by the ACOG, of which Dr. Gentile is a member. In fact, plaintiffs' own expert, Dr. Marc Engelbert, who like Dr. Gentile testified as an expert in the field of obstetrics and gynecology and not biomechanical engineering, also commented on the ACOG report during his testimony.

The trial court did not err in ruling Dr. Gentile's opinions fell within the field of her expertise. Dr. Gentile has been a board-certified OBGYN for over 25 years. She has participated in hundreds of deliveries (approximately 800-1000), including over 20 deliveries with shoulder dystocia. She was accepted as an expert in the field

13

of obstetrics and gynecology without objection by plaintiffs. Additionally, in a medical malpractice case, the defendant physician may offer his own expert testimony regarding causation. *Gros v. LAMMICO*, 20-0083 (La. App. 1st Cir. 11/12/20), 316 So.3d 61, 73; see *Pfiffner v. Correa*, 94-0924 (La. 10/17/94), 643 So.2d 1228, 1235. The testimony at issue touched on the issue of causation since it concerned alternate causes of Elias' injuries other than excessive traction. Considering the circumstances, we find no abuse of discretion or error by the trial court in allowing the testimony of Dr. Gentile at issue.

## EVALUATION OF MEDICAL EVIDENCE
### (Assignment of Error Number Three)

Plaintiffs argue the trial court failed to properly consider the medical evidence presented and rendered a decision lacking a rational basis. Specifically, plaintiffs contend the trial court erred in considering the excluded expert report of Dr. Robert Moore, which relied on the ACOG report, and in basically ignoring the testimony of Dr. Scott Kozin, despite his notable qualifications.[9]

Dr. Moore testified at trial on behalf of plaintiffs and was accepted by the trial court as an expert in the field of obstetrics and gynecology. He specializes in maternal fetal medicine high risk pregnancies. Dr. Moore was a member of the Medical Review Panel (MRP) that reviewed plaintiffs' complaint against Dr. Gentile and unanimously found no breach of the standard of care. Upon plaintiffs' pretrial motion, the trial court ruled Dr. Moore would not be permitted to testify as to any opinion on causation included in his second expert report since the report was untimely filed. Accordingly, Dr. Moore's trial testimony was limited to the applicable standard of care. It appears the trial court, however, may have considered Dr. Moore's excluded expert report since the court's oral reasons for judgment refer

---

[9] Plaintiffs also contend the trial court erred in permitting and relying on Dr. Gentile's testimony commenting on the ACOG report, a contention we have previously rejected.

14

to matters apparently included in the excluded expert report but not in Dr. Moore's trial testimony. In particular, plaintiffs point to the trial court's reference to Dr. Moore's reliance on the ACOG report on brachial plexus injuries, as well as his opinion that a "brachial plexus injury is not evidence of a mismanaged shoulder dystocia because there are reported cases of brachial plexus injury after uncomplicated deliveries and although rare even a cesarean delivery." Dr. Moore did not testify to either matter at trial.

We agree it would be improper for the trial court to have considered Dr. Moore's excluded expert report. Nevertheless, under La. C.E. art. 103(A), an error may not be predicated upon the admission of evidence unless a substantial right of the party is affected. The proper inquiry for determining whether a party was prejudiced by the improper admission of evidence is whether the alleged error, when compared to the entire record, had a substantial effect on the outcome of the case. If the effect on the outcome of the case is not substantial, reversal is not warranted. See *Chiasson v. Louisiana Medical Mutual Insurance Company*, 19-0618 (La. App. 1st Cir. 6/18/20), 307 So.3d 204, 209.

Considering the entirety of the record, we find any error by the trial court in considering Dr. Moore's excluded expert report was harmless. The trial court's brief reference to the content of Dr. Moore's excluded report comprised only a very small portion of the trial court's extensive reasons for judgment in which it addressed the testimony of numerous other expert and lay witnesses. Further, the trial court's reference to Dr. Moore's reliance on the ACOG report and his opinion that a brachial plexus injury was not indicative of a mismanaged shoulder dystocia was cumulative of other evidence in the record to the same effect. Both Dr. Tencer and Dr. Gentile gave testimony indicating a brachial plexus injury is not necessarily caused by a mismanaged shoulder dystocia. Dr. Tencer testified there were at least three mechanical forces that could contribute to such an injury: traction by a physician

15

(exogenous force), natural forces exerted by the mother (endogenous force), and rotation. Similarly, Dr. Gentile pointed out the ACOG report concluded excessive traction by the physician was not the sole cause of brachial plexus injuries in newborns. Further, the ACOG report itself was introduced into evidence by the defense, without objection from plaintiffs. According to the ACOG report "the obstetrician's efforts to relieve shoulder dystocia are not the whole explanation for brachial plexus birth injuries." The ACOG report concluded the occurrence of such injuries "is a complex event, dependent not only on the forces applied at the moment of delivery, but also on a constellation of forces ... that have been acting on the fetus during the labor and delivery process, as well as individual fetal tissue characteristics."[10] Thus, considering the cumulative nature of Dr. Moore's expert report, we believe any consideration of the report by the trial court had no substantial effect on the outcome of the case.

Additionally, plaintiffs complain the trial court was dismissive and did not give sufficient weight to the opinions of their expert, Dr. Kozin, as shown by the court barely mentioning him in its lengthy reasons for judgment. They argue the trial court erred in accepting the opinion of defense expert, Dr. Tencer, that excessive traction was not the exclusive cause of brachial plexus injuries over Dr. Kozin's opinion that, given the severity of Elias' injury, downward lateral traction by Dr. Gentile was the only logical explanation for the injury.

In this case, experts for the opposing parties gave conflicting opinions regarding the cause or possible cause of Elias' brachial plexus injury. Plaintiffs'

---

[10] Additional conclusions reached in the ACOG report include the following: "severe and persistent injuries may occur to the brachial plexus without the clinician's application of traction during delivery;" "no published clinical or experimental data exist to support the contention that the presence of persistent (as compared to transient) [brachial plexus injuries] implies the application of excessive force by the birth attendant;" nerve damage may involve both traction and compression, but "[c]ompression alone can result in permanent injury if the compression is maintained for a sufficient period and is of significant magnitude."

16

experts, Dr. Kozin (pediatric orthopedic surgeon) and Dr. Engelbert (OBGYN), opined that, given the severity of Elias' brachial plexus injury, the only explanation for the injury was excessive downward traction by Dr. Gentile. Dr. Allen, plaintiffs' expert biomedical engineer, estimated Dr. Gentile applied 40-45 pounds of traction, as opposed to normal traction of 0-10 pounds.

During her testimony, Dr. Gentile specifically denied using lateral downward and/or excessive traction, testifying she used only "standard traction." She disputed Dr. Allen's opinion that she applied 40 pounds of traction. During his testimony, Dr. Tencer was highly critical of Dr. Allen's methodology in calculating his estimate of the amount of force exerted by Dr. Gentile and demonstrated the amount of physical exertion required to reach 40 pounds of force. Both Dr. Gentile and Dr. Tencer testified to possible causes of brachial plexus injuries occurring during childbirth other than excessive traction, including endogenous force exerted by the mother during labor. Dr. Gentile also pointed out that Elias' floppy muscle tone, reflected in an Apgar score of two at birth, may have contributed to him having less natural protection from injury. The ACOG report noted a study indicating low Apgar scores "potentially indicate fetal depression, which can result in both reduced muscle tone and lower resistance to any applied force." The ACOG report also supports the defense position that excessive downward traction is not the only logical explanation for Elias' brachial plexus injury. Additionally, Dr. Moore (OBGYN), a member of the MRP, opined Dr. Gentile did not breach the applicable standard of care.

The assessment of factual conflicts, including those involving the contradictory testimony of expert witnesses, falls within the province of the trier-of-fact, which was the trial court in this instance. Thus, it was for the trial court to evaluate conflicting expert opinions in relation to all the circumstances of the case. *Gros*, 316 So.3d at 69. The trial court is free to accept or reject, in whole or in part,

17

the testimony of any witness, including the opinions expressed by experts. *Shoats v. McKenzie*, 11-0573 (La. App. 1st Cir. 11/9/11), 2011 WL 5408737, at *6 (unpublished), writ denied, 12-0262 (La. 3/30/12), 85 So.3d 123. On appeal, the trial court's findings may not be set aside unless they are manifestly erroneous or clearly wrong. Where there are two permissible views of the evidence, the trier-of-fact's choice between them cannot be manifestly erroneous. On review, the issue to be resolved is not whether the trial court was right or wrong, but whether the court's findings were reasonable. Further, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. *Gros*, 316 So.3d at 69-70.

Our review of the record reveals a reasonable factual basis exists for the judgment in favor of Dr. Gentile. The trial court's findings, including its decision to accept the testimony of Dr. Gentile and her experts over the testimony of plaintiffs' experts, including Dr. Kozin, as well as the other evidence presented by plaintiffs, reflect a permissible view of the evidence. This court cannot say the trial court's findings were manifestly erroneous or clearly wrong.

### WITNESS CREDIBILITY
(Assignment of Error Number Five)

Plaintiffs argue the trial court erred in assessing the credibility of the defense's lay witnesses because it failed to find their testimony was impeached on several matters on which conflicting testimony was presented. Plaintiffs contend Dr. Gentile and the delivery room nurses who testified on her behalf "deliberately, knowingly, and falsely misrepresented material facts, including: whether a nurse climbed on top of the bed in the delivery room and pressed her knee or shin against Mrs. Fitch's abdomen;[11] where Mrs. Fitch's sister-in-law, Skye Lajaunie, was

---

[11] Both Mrs. Fitch and Ms. Lajaunie testified a nurse climbed on top of the bed in the delivery room and pressed her knee or shin against Mrs. Fitch's abdomen or pelvis. The application of fundal pressure, which constitutes a breach of the standard of care, occurs when someone presses against the top of the mother's uterus, thereby pushing the baby against the mother's pubic

18

standing in the delivery room when Elias was born;[12] and whether the medical records would normally note if the mother was instructed during delivery to stop pushing.[13] Plaintiffs also assert Dr. Gentile misrepresented that photos she took of the delivery room accurately reflected how the delivery room looked on the date of Elias' delivery.

When findings are based on credibility determinations, the manifest error-clearly wrong standard is applicable. Only the trier-of-fact can be aware of the variations in a witness's demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Accordingly, the trier-of-fact's credibility determinations must be accorded great deference on appeal. *In re Interdiction of Gambino*, 21-00267 (La. 4/20/21), 313 So.3d 1239, 1240.

In its oral reasons for judgment, the trial court specifically addressed plaintiffs' contention that the testimony of Dr. Gentile and the nurses was not credible since their testimony regarding where Ms. Lajaunie was standing during

---

symphysis. Cindy Adams, one of the delivery room nurses, testified she did have to "hike" herself onto the bed, with one of her legs on the bedrail and her other leg on the mattress beside Mrs. Fitch, to achieve the right angle to apply suprapubic pressure to Mrs. Finch. She denied, however, using her knee or shin on Mrs. Finch's abdomen or pelvis to apply fundal pressure. Similarly, Dr. Gentile and the other nurses denied seeing anyone using a knee or shin on Mrs. Fitch's abdomen or pelvis to apply fundal pressure. In its reasons for judgment, the trial court accepted the testimony of the defense witnesses on this matter, specifically concluding that no one used their knee or shin to apply fundal pressure to Mrs. Fitch's stomach.

[12] At trial, Ms. Lajaunie testified she was standing behind Dr. Gentile during Elias' delivery. She stated she saw Dr. Gentile pull on Elias' head so hard that she was trembling like someone picking up something heavy and saw Elias' neck "kind of like stretch" to what seemed like an unnatural position. Dr. Gentile and some of the nurses indicated, however, that there was not enough room for Ms. Lajaunie to have been standing behind Dr. Gentile where she claimed because of the position of Dr. Gentile's instrument tray. During trial, the trial court visited the delivery room with the consent of the parties and concluded there was sufficient room for Ms. Lajaunie to have been standing where she claimed. Nevertheless, the trial court did not accept Ms. Lajaunie's testimony that Dr. Gentile used excessive force pulling on Elias' head.

[13] Plaintiffs contend delivery nurse Andrea Trosclair was directly impeached at trial when she gave testimony inconsistent with her deposition testimony. During her deposition, Ms. Trosclair initially replied in the negative when plaintiffs' counsel asked whether it would typically be included in the medical records if a mother was told to stop pushing during delivery. Counsel then asked her if she understood the question, which he then repeated. Ms. Trosclair replied, "Yeah, usually." When Ms. Trosclair was asked the same question at trial, she responded, "It's – it's a given day to day thing. We don't there's not a box for it." When counsel pointed out her response at her deposition, Ms. Trosclair indicated she must have misunderstood the question at that time.

19

Elais' delivery was incorrect. The trial court rejected this contention and found the testimony of Dr. Gentile and her witnesses to be credible. In resolving the conflicting testimony presented, the trial court indicated it did not feel anyone had intentionally mislead the court. The trial court noted factors that may have contributed to the discrepancies in the witnesses' testimony included the sense of urgency created by the emergency situation occurring during Elias' delivery, the events in question having occurred over four years earlier, and the possibility of laypersons interpreting their perceptions differently than medical professionals did.

As indicated by its lengthy reasons for judgment, the trial court carefully and thoroughly considered all of the evidence presented during the four-day trial of this matter, as well as the credibility and reliability of the witnesses for both sides. Based on our review of the record, we cannot say the trial court's credibility determinations, or the factual findings it made based on those determinations, were manifestly erroneous or clearly wrong.

## CONCLUSION

For these reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to plaintiffs-appellants.

**AFFIRMED.**